## TURLINGTON v WILLIAMS
### Case No. 84-3697
State of Florida, Division of Administrative Hearings

March 25, 1985

### APPEARANCES OF COUNSEL

**George L. Wass, Slepin, Slepin, Lambert & Wass,** for petitioner.
**Bruce M. Williams,** pro se.

### OPINION

ARNOLD H. POLLOCK, Hearing Officer.

### RECOMMENDED ORDER

Consistent with the Notice of Hearing furnished the parties by the undersigned on November 28, 1984, a hearing was held in this case before Arnold H. Pollock, a Hearing Officer with the Division of Administrative Hearings, in Gainesville, Florida on February 11, 1985. The issue for consideration was whether the Respondent's teaching certificate should be disciplined because of the allegations contained in the Administrative Complaint filed in this case.

### BACKGROUND INFORMATION

On September 25, 1984, Ralph D. Turlington, Commissioner of

Education for the State of Florida, filed an Administrative Complaint dated September 19, 1984, against the Respondent in this case, Bruce M. Williams, wherein Petitioner sought to take appropriate disciplinary action against the Respondent's teaching certificate because of various alleged violations of Section 231.28, Florida Statutes, which include that the Respondent, (a) trespassed upon private and public property after having been warned against such activity, and upon trial was found guilty of said trespass; (b) after trial at which he pleaded no contest, was placed on probation for allegedly unlawfully handling or assaulting a minor female under the age of 14 in a lewd, lascivious, or indecent manner; and (c) on several applications for employment, knowingly and willingly falsifying information. Also, on September 19, 1984, Commissioner Turlington forwarded a copy of the Administrative Complaint to Respondent by certified mail, indicating that probable cause had been found to justify disciplinary action. Thereafter, on September 30, 1984, in a letter of equal date to Commission Turlington, Respondent requested the disciplinary be postponed for a time sufficient for him to seek legal counsel and on October 12, 1984, he filed a formal election of rights form in which he disputed all allegations contained in the Administrative Complaint. The file was forwarded to the Division of Administrative Hearings for reference to a Hearing Officer on October 16, 1984.

At the hearing Petitioner presented the testimony of Virginia Niswonger, Deputy Clerk for Alachua County; Jim P. Cervone, an Assistant State Attorney for the 18th Judicial Circuit; Vincent J. Patruccio, also an Assistant State Attorney; Kenneth E. Solomon, an investigator with the University of Florida Police Department; Keith B. Reddick, formerly an officer with the University of Florida police; Donald G. Rogers, an investigator with the same department; Edward H. Miles, an officer with the university police; Dr. Amelia Cruz, a member of the faculty of the University College of Medicine; Dominick D. Pape, a detective with the Gainesville Police Department; Catherine L. Birdsong, a consultant with the State Department of Education Professional Practices Services; Sharron A. Sturtevant, an employee of one of Respondent's other employers; Virginia R. Strozier, a retired faculty member from the University College of Nursing; Visiliki Vlahopous; Mary Anne Westphal; Charles F. Collins, Jr., Respondent's probation officer; John A. Middleton, principal of Ft. Clarke Middle School; and Wilford A. Griffin, a career services specialist with the Alachua County School Board. Petitioner also presented Petitioner's Exhibits 1 through 16.

Respondent testified in his own behalf and called Officer Reddick as

his witness as well as for the Petitioner, and introduced Respondent's Exhibits A through E.

The parties have submitted posthearing findings of fact pursuant to Section 120.57(1)(b)4, Florida Statutes. A ruling on each proposed finding of fact has been made either directly or indirectly in this Recommended Order, except where such proposed findings of fact have been rejected as subordinate, cumulative, immaterial, or unnecessary.

## FINDINGS OF FACT

At all times pertinent to the issues involved in this case, Respondent, Bruce M. Williams, held Florida teacher certificate number 414669 authorizing him to serve as a substitute teacher.

On March 21, 1984, after a trial by jury in the County Court of Alachua County, Florida, on Case No; 83-4274-MM-A, Respondent was found guilty of the offense of trespass after warning.

On April 30, 1984, the Judge of the County Court entered a Judgment of Guilt and placed the Respondent on one year's probation with the stipulation that, among other things, he not go onto the University of Florida campus unless his probation officer gave him prior permission. This judicial determination of guilt was the culmination of a series of events involving the Respondent and his repeated entrances onto property owned by the University for which he was repeatedly warned and directed not to return. Respondent contends that he had legitimate reasons to be on the University property each of the times in question and contests the use of these reports branding them a violation of his rights. He overlooks the fact that the conviction came after several instances of unauthorized entrance and that the conviction was based on proven violations.

Nonetheless, it appears that on December 30, 1982, Respondent was observed by Kenneth E. Solomon, an investigator with the University police department, in the parking lot of Diamond Village, a University married students housing area not open to the public. Mr. Solomon attempted to identify the Respondent who was at first reluctant to identify himself but who finally agreed and indicated that his wife was inside doing their laundry. Since this is an area reserved for university students and their families, Mr. Solomon issued a warning to Respondent not to trespass on University property and thereafter filled out and filed a report of the incident.

Thereafter, on March 15, 1983, Keith B. Reddick, who was at that time an officer with the University police was called to University Hospital (Shands), where he was met by a Mrs. Fugate and a guard

144

who had Respondent in custody. Mrs. Fugate advised at that time that Respondent had previously been at the hospital on March 7 with no legitimate reason for being in the area. On that occasion, when asked why he was there, Respondent indicated he had been given permission to be there by a member of the medical school faculty, Dr. Cruz. Dr. Cruz categorically denies ever having given Respondent permission to be where he was. In fact, she met him only once when he stopped her and asked her about the possibility of a job with the hospital. At that time she told him there were none available except for fellowships for which an applicant had to be a physician already. Nonetheless, he gave her a resume and she believes he indicated he was involved in research. With this one exception, she has had no contact with him and never gave him authority to work with patients in her department or be there for any reason. On this latter occasion, when asked what he was doing there, Respondent replied that he had become lost while looking for a laboratory. He also said he was looking for a doctor friend whose name he could not remember and as a chemistry major, was working on his thesis.

On this occasion, Officer Reddick took Respondent to the police station, showed him a map of the campus, told him where he could and could not go on the campus by pointing to the map areas, and told him not to return again to the university unless on official business or for public functions.

The following day, on March 16, 1983, Respondent was observed in the Shands Hospital cafeteria by Officer Rogers of the University police. When asked for his identification and reason for being there, Respondent indicated he had paid a bill in the laboratory, so Rogers let him go. When Rogers checked the story out, however, he found that the bill which was alleged to have been for unauthorized use of the hospital copying machine, had in reality been paid three hours before Respondent was contacted.

Rogers again saw Respondent on March 29, 1983 in the hub area of the University book store on campus. Rogers had been notified by Reddick that Respondent was on campus and when he had approached the Respondent, Respondent walked off and into the book store. Rogers and three other officers contacted Respondent in the book store where Respondent indicated he had met with a Mrs. Greene, a University affirmative actions officer and upon receiving that explanation, the officers let him go.

Respondent was again identified on July 6, 1983 by officer Edward Miles who observed him in an off-limits gynecological area on the 4th

floor of the University hospital. When Miles arrived at the scene, a contract security officer was talking with Respondent. This officer had seen Respondent in the area and had asked for identification in response to which request, Respondent showed a student identification card which was no longer valid since Respondent was no longer a student. Asked what business he had in this particular area, Respondent indicated he was looking for work but when, after 30 minutes, he could not verify this story, Officer Miles placed Respondent under arrest and took him to campus police headquarters.

From all of the above, it is clear that though Respondent may have felt he had a legitimate basis for being on the campus and, in fact, may have had when he went to speak to Mrs. Green and went to pay the bill at the hospital, he stretched these occasions into several unauthorized occasions even after he had been warned with full knowledge that his presence on the campus was not authorized. The conviction in County Court was not contested at the time and on the basis of the above evidence, appears to have been warranted.

On July 8, 1983, an arrest warrant was issued out of the Circuit Court for the 8th Judicial Circuit in Alachua County alleging sexual battery in violation of Section 794.011 Florida Statutes. This warrant contained allegations that Respondent had committed a sexual battery against his 9 year old stepdaughter. However, Respondent was tried on a reduced charge of lewd and lascivious assault upon a child and at his trial he entered a plea of no contest. Respondent was found guilty and sentenced to 10 years probation the terms of which required him to undergo mental health counseling among other requirements. Respondent continues to deny his commission of the offenses to which he pleaded no contest at the trial. However, in a statement he made at the time of his arrest, he admitted several factors which contradict that. He admitted that he had a very physical relationship with his stepdaughter; that he appeared nude in front of her many times; and that he would be in bed with her laying on top of him while both were nude with the child's mother there as well. He also admitted having French kissed his stepdaughter (she indicates he taught her how to do this) but denies having any sexual intercourse with her. Respondent contends that these charges are all a plot to deprive him of the close relationship with his family, instituted by someone unnamed and unidentified. The fact remains that Respondent is delinquent in his probation and has made little progress in the required mental health counseling because of his continued belief that he has done nothing wrong but is the victim of this conspiratorial plot.

Sometime in or around February, 1984, Respondent entered the

146

restaurant owned and operated by Mrs. Vlahopous, in Gainesville, and asked to speak with her daughter, Alex, who apparently had come to the blood center at which he worked. At this point Respondent identified himself as "Dr. Bruce." When she asked him for his office address and phone number since Alex was not there, he said he didn't have an office, but he wrote his name and phone number on one of her cards for her. After Mrs. Vlahopous thought about this over night, she went to the blood bank where Respondent had said he worked and asked for Dr. Williams. At this point she was told by blood bank personnel that Williams was not a doctor, had been fired, and would be rejected if he came there again. Be that as it may, Sharron A. Sturtevant, an official of the blood bank where Respondent had been working, does recall that at times Respondent was referred to as Dr. Bruce at the center. This was, however, only a term of affection or friendliness and was not in any way intended to authorize him to hold himself out to the public as a doctor.

Respondent did work for the City of Gainesville in a conservation project in May and June of 1984 but he was terminated because he had not listed his full police record on the application form. This termination was a matter of necessity under city personnel policies which required termination of anyone who intentionally falsified an application form. It had nothing to do with Respondent's performance or anything that took place while he was employed by the city.

Mr. John Middleton, Principal of Ft. Clarke Middle School, knew Respondent as a para-professional at the alternative school when Mr. Middleton was principal there and Respondent was employed for approximately a month and a half. While Respondent was working at the alternative school he was working as aide to another teacher. He was apparently unable to accept the fact, however, that when a teacher and a para-professional (aide) are in the same classroom, it is the teacher who always is in charge.

Respondent was discharged from his employment at the alternative school because of an incident where it was alleged he had usurped the authority of and changed the orders of the teacher for whom he was working, in front of the class. The investigation report, which Mr. Middleton received from the teacher and students who observed the incident indicated that the Respondent was loud and boisterous at the time of the incident. Since these students at the alternative school were emotionally handicapped to start with, a fact which Respondent knew, his misconduct was even more serious than it would have been in a normal situation. These students need calm more than noise. In the situation here, Respondent's actions served only to upset them.

147

Mr. Middleton had observed that prior to this incident, Respondent's dealings with the students aggravated rather than helped them. As a result, this incident was only one factor in the decision to terminate Respondent from employment and after the incident took place, Mr. Middleton wrote an unsatisfactory performance report on the Respondent.

Based on his personal observation of the Respondent, and what he now knows of Respondent's criminal record, Mr. Middleton is convinced that a teacher with this record could not be effective in the classroom. His effectiveness would be definitely reduced by his misconduct and his conduct would not set a positive example for students. In his opinion, students should not be exposed to anyone with criminal convictions.

These sentiments are reinforced by Mr. Wilford A. Griffin, a career service specialist with the Alachua County School Board, who first met Respondent when Respondent left Newberry High School seeking a place in the Alachua County system. Respondent had been terminated at Newberry High School because of some problem with his certification which had nothing to do with performance or misconduct. After the alternative school termination referenced above, Respondent was placed at Eastside High School but was terminated there because of his difficulties with teachers similar to those he had at the alternative school. As an aide, he disagreed openly with teachers in the classroom and in this case, the teacher complained that he would not follow directions and would not do what the teacher wanted done.

In all cases, Mr. Griffin counseled with the Respondent about the problem. Respondent obviously felt that the complaining teacher was demeaning him. He felt that he was being helpful and had been rebuffed. Based on his experience with this Respondent, Mr. Griffin would never again try to place him within the school system. Considering Respondent's record in and out of the classroom, Mr. Griffin could not recommend Respondent for employment in the school system. He believes Respondent could not be an effective teacher because of his inability to understand the ramifications of his actions. This does not even consider the convictions which merely aggravate the situation even more.

There is no evidence to counter these professional opinions of Respondent's fitness to teach and they are accepted and adopted as fact.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of these proceedings.

Under the provisions of Section 231.28(1), Florida Statutes, the Education Practices Commission has the authority to discipline the teacher certificate of any holder thereof provided it can be shown that the holder has, *inter alia,*

(c) been guilty of gross immorality or an act involving moral turpitude;

. . . . . . . . . .

(f) been found guilty of personal conduct which seriously reduces his effectiveness as en employee of the school board; or

. . . . . . . . . .

(h) has otherwise violated the provisions of law or rules of the State Board of Education.

In order to support discipline of a license, the Petitioner herein, as the regulatory agency for Respondent's license has the burden of establishing its case against the Respondent by competent substantial evidence in support of the allegations against him. *Harvey v. State, Department of Business Regulation,* 451 So.2d 1065 (Fla. 5th DCA 1984).

In the Administrative Complaint Petitioner alleges that Respondent's convictions bring him within the purview of the provisions of Section 231.28(1)(c)(d) and (h), Florida Statutes, outlined above. The evidence of record clearly establishes that Respondent was in fact found guilty of both a misdemeanor (the trespass) and a felony (the assault on a child under 14). Both of these incidents fall within the parameters of subsection (f) in that the convictions are for personal conduct which not only in the eyes of the experts who testified, but surely in the eyes of any rational human being, would seriously reduce his effectiveness as an employee of the school board in a classroom situation. It is incontestable that someone convicted, as Respondent has been, of the sexual molestation of any child, let alone his own stepdaughter, is not fit to be in a classroom situation. Of a somewhat less aggravating nature is the conviction for trespass after being warned which clearly reflects Respondent's utter and abject contempt for rules, regulations, and authority if they do not conform to his thinking. Beyond question, an individual demonstrating this type of conduct should not be placed in a position of instructor or role model for impressionable, school age youth. The evidence clearly establishing the convictions, Respondent's explanation of the reasons therefor may be considered at mitigation but not exculpation. In their best light, however, the factors cited by the

Respondent in no way tend, in the estimation of this writer, to mitigate to any degree the seriousness of his offenses. There was no evidence to establish Respondent's contention of conspiracy, merely his allegations that it exists. Findings of fact and conclusions of law are based on evidence, not allegations unsupported by evidence.

Of similar importance to the convictions is the obvious fantasy world in which Respondent lives regarding his positions and authority in his dealing with others. Though not a physician, he assumed the title of "Doctor" and though not employed as a teacher in the classroom, he attempted to usurp the authority of the teachers placed over him totally disregarding the effect that his actions had on the students assigned to his care.

It is clear, therefore, that this Respondent is totally unsuited to be licensed as a teacher in this or any other state.

## RECOMMENDED ACTION

Based on the foregoing findings of fact and conclusions of law, it is, therefore:

RECOMMENDED that Respondent's teaching certificate be permanently revoked.